**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **SIDNEY WATTS TAYLOR,** | : | **Case No. 1:06 CV 854** |
| | : | **Judge Barrett** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **REPLY BRIEF** |
| | : | **OF DEFENDANT H.B. FULLER** |
| **H.B. FULLER COMPANY,** | : | **COMPANY IN SUPPORT OF ITS** |
| | : | **MOTION FOR SUMMARY** |
| **Defendant.** | : | **JUDGMENT** |

**I.      Introduction**

In opposing summary judgment, Taylor now argues he was the victim of unlawful sex "stereotyping" based on a handful of incidents spread from 2000 to June 2006. But that is not what Taylor said repeatedly in his deposition, when he claimed he was singled out for harassment because he is "gay." (Taylor Dep. p. 354).  Discrimination based on sexual orientation does not violate federal or Ohio law.  As a result, Taylor has failed to present evidence creating a disputed issue of material fact on his claim of harassment based on sex.

Taylor also has failed to establish a disputed issue of material fact on his retaliation claim. An employer can justifiably terminate a manager who misuses the company's computer system and hardware by using it to download pornographic images, to engage in sado-masochistic internet "matchmaking," and to transmit confidential company information for the apparent purpose of writing a "tell all" book to embarrass the company.  Taylor has not raised a material question of fact as to whether these stated grounds for discharge were a pretext for retaliation.

**II.     Taylor's Discrimination Claim Fails Because Homosexual Behavior/Affiliation Does
          Not Constitute "Gender Non-Conforming Behavior" under Sixth Circuit Precedent.**

Because, as discussed <u>infra</u>, Title VII does not prohibit discrimination based on sexual orientation, Taylor has reinvented his claim as "sex stereotyping." Taylor now argues that his

colleagues treated him "as if he were a woman rather than a man."  (Pl.'s Br. at 23).  This

argument is unsupported by any evidence and is contrary to Taylor's previous testimony and

writings.   In his 300-plus page journal and at his deposition, Taylor repeatedly claimed that he

was discriminated against because he is gay.  In his journal he states:

> Is this about me being gay?  I don't know. Maybe not, but I am a gay employee.  I
> am a published writer of gay fiction.  I openly live with another gay man.  Did
> anybody else get a "die OSHA fag" note under his or her door?   . . .

(Ex. 12 to Taylor Dep., at 000538).  At his deposition, he was asked about this passage

from his journal:

> Q.     . . . I mean, did you, in fact, think that the reason you were being
>         mistreated was because you were gay?
>
> A.     I think that was part of it.  Yes, sir.
>
> Q.     And what was the other part of it?
>
> A.     Part of it was that I was not Catholic, but I don't know how germane that
>         is.  I think the other part of it was that I had tried to improve the working
>         situation there for myself and for other employees.

(Taylor Dep., p. 354).

Taylor's newly invented "sex stereotyping" claim fails because in a sex stereotyping

case, the plaintiff "must show that the employer actually relied on [his/her] gender in making its

decision."  *PriceWaterhouse v. Hopkins,* 490 U.S. 228, 251 (1989).[1]   "Sex stereotyping" means

appointing certain behavior characteristics as suitable for women or for men, but not for the other

sex.  *Dillon v. Frank,* 1992 U.S. App. LEXIS 766, n.3 (6th Cir.  Jan. 15, 1992).  But there are no

facts in the record that show Fuller made any employment decision because Taylor did not

---

[1] In *PriceWaterhouse*, the Court found sex stereotyping present because the employer acted "on the basis of a belief that a woman cannot be aggressive, or that she must not be."  490 U.S. at 251.  The Court explained that Title VII is designed to relieve women from discrimination leveled by "[a]n employer who objects to aggressiveness in women but whose positions require this trait"; such an attitude, the Court reasoned, "places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not." Id.

exhibit "male characteristics."  Because homosexuality is not peculiar to only one gender, it cannot be considered non-gender-conforming behavior.

Taylor relies on *Smith v. City of Salem*, 378 F.3d 566, 574 (6th Cir. 2004), in which the plaintiff was a transsexual undergoing a physical transformation from male to female.  Plaintiff's co-workers felt that his appearance was inappropriate for a male.  Plaintiff was suspended based in part on co-workers' complaints that his "appearance and mannerisms were not 'masculine enough'" Id. at 568.  The Sixth Circuit found that the alleged discrimination was motivated not by the plaintiff's sexual orientation, but by his appearance and mannerisms, which his employer "felt were inappropriate for his perceived sex."

In this case, Taylor has not identified any alleged discrimination based on the fact he is male or because of any stereotyping based on traditional notions of masculinity.  Taylor asserts that co-worker Hayes treated him like a woman by throwing women's panties on his desk, presenting him with a mock bloodied diaper, and brandishing a mock tampon.  (Pl.'s Br. at 23).  Taylor has not claimed, however, that he, in some observable manner, acted (or was perceived to act) contrary to the traditional male stereotype in appearance or mannerisms at work.

Instead, Taylor's allegations are comparable to those at issue in *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757 (6th 2006), cert. denied, 127 S.Ct. 2910 (2007), in which, the plaintiff, a homosexual, argued that he was harassed by co-workers who were motivated by his "gender non-conformity."  He claimed that co-workers impressed the word "FAG" on his report forms, repeatedly touched his crotch with a tape measure; handcuffed him and photographed someone simulating sex with him; grabbed his chest while making derogatory remarks; and attempted to shove a sanitary napkin in his face.  453 F.3d 759-60.  Like Taylor, who now claims that his "co-workers were treating him as if he were a woman rather than a man," (Pl.'s Br. at 23), Vickers

argued that his co-workers viewed his sexual practices as requiring him to "behave[] more like a woman" than a man.  453 F.3d at 763.   The court held that "the theory of sex stereotyping under *PriceWaterhouse* is not broad enough to encompass such a theory."  Id.     The Sixth Circuit found that the "behavior" at the heart of Vickers' complaint was "behavior not observed at work or affecting his job performance."  Id.  The court explained:

> The Supreme Court in *Price Waterhouse* focused principally on characteristics that were readily demonstrable in the workplace, such as the plaintiff's manner of walking and talking at work, as well as her work attire and her hairstyle. . . . Later cases applying *Price Waterhouse* have interpreted it as applying where gender non-conformance is demonstrable through the plaintiff's appearance or behavior.

Id. (citations omitted).  Vickers' claim failed, as Taylor's should, because no evidence was offered to show that his appearance or behavior at work did not conform to a traditional male stereotype.

The Sixth Circuit concluded that recognition of Vickers' claim would be tantamount to amending Title VII to prohibit sexual orientation discrimination:  "In all likelihood, any discrimination based on sexual orientation would be actionable under a sex stereotyping theory if this claim is allowed to stand, as all homosexuals, by definition, fail to conform to traditional gender norms in their sexual practices." Id. at 764.[2]

Further, the only conduct Taylor points to as involving "gender stereotyping" are the three incidents involving Bob Hayes spread over more than a year.  (See discussion in S.J. Mem., pp. 4-5). The other allegations of harassment, including the "groping" by Wayne Harley or Bob

---

[2] See also *Dillon v. Frank*, 1992 U.S. App. LEXIS 766, * 22 (6th Cir. Jan. 15, 1992) (holding that co-workers' comments, graffiti, and assaults directed at demeaning the plaintiff, not because he was male, but solely because they disapproved of his alleged homosexuality, were cruel but not illegal under Title VII).

Boice's "bear hug" involved conduct to which Taylor claims that other males, regardless of appearance or mannerism, and some females were also exposed to at work.[3]

### III.   Taylor's Hostile Environment Claim Fails Because He Has Neither Demonstrated the Existence of Harassment Based on Gender Nor that the Alleged Harassment Was Severe and Pervasive.

The Supreme Court has identified three ways a male plaintiff can establish a hostile work environment claim based on same-sex harassment: (1) where the harasser has made sexual advances out of sexual desire; (2) where the harasser is motivated by general hostility toward men in the workplace; and (3) where the plaintiff offers "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80-81 (1998); *Vickers v. Fairfield Med. Ctr.*, supra, 453 F.3d 757, 765 (6th Cir. 2006).  None of these have been demonstrated by Taylor in this case.

In *Oncale*, the Supreme Court explained that "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discrimination* . . . because of . . . sex.'"  523 U.S. at 80 (emphasis in original).  Conduct that is "gross, vulgar, male horseplay in a male workplace," or "the classic example of men behaving badly" is not actionable under Title VII when it does not "actually constitute [ ] 'discrimination because of sex.'"  *EEOC. v. Harbert-Yeargin*, 266 F3d. 498, 522 (6th Cir. 2001).  Furthermore, workplace harassment does not constitute sex discrimination merely because the words used have sexual content or connotations.  *Oncale*, 523 U.S. at 80.

The only conduct to be considered in evaluating a hostile environment claim is conduct that would not have occurred but for the plaintiff's gender.  *Morris v. Oldham Cty. Fiscal Ct.*,

---

[3] Taylor testified that Dave Cochran and other presumably "traditional males" were exposed to Harley's "groping." (Taylor Dep., 98, 105-06). Other male employees, regardless of appearance or mannerisms, were exposed to incidents such as the viewing of scenes from "Deliverance," or office graffiti. (Taylor Dep. 96, 137). Likewise, Taylor testified that Bob Boice "grappled" with other employees.  (Taylor Dep. 159).

201 F.3d 784, 790-91 (6th Cir. 2000). "If the nature of an employee's environment, however

unpleasant, is not due to [his] gender, [he] has not been the victim of sex discrimination as a

result of that environment.'" *Baugham v. Battered Women, Inc.*, 211 Fed. Appx. 432, 438 (6th

Cir. 2006) (quoting *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1263 (10th Cir. 2005).[4]

Because Taylor has not established that any allegedly harassing conduct directed at him was

because of his status as a male, summary judgment in favor of Fuller is required.

Taylor, relying on the deposition testimony of his assistant David Cochran, claims that

ridiculing comments were made about him "weekly." However, the crude comments were

related to his sexual orientation, *not* his gender:

> Q.    . . . [H]ow often and with what frequency did you hear comments that were
> crude, negative or ridiculed [Taylor] because of his *sexual orientation*?
>
> A.    Weekly.

(Cochran Dep., p. 30 (emphasis added)). Furthermore, Cochran provides a second reason for the

ridicule, also unrelated to gender. He claims that lab workers were resented because they had a

more comfortable working environment than those who worked on the production floor:

> Q.    Did you think that the difference in the environment between being on the
> factory floor and being in the lab was something that caused you to be the
> butt of jokes by factory people.
>
> A.    Well, I wasn't, you know, very privileged to hear that sort of thing but,
> yeah, I believe it.

(Id., pp. 44).

Even if Taylor could overcome the fact that the alleged harassing conduct was unrelated

to his gender, he has not established that the conduct was severe or pervasive. Whether an

---

[4] See also *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) (affirming summary judgment in favor of employer and explaining "many of the alleged harassing acts cannot be considered in the hostile environment analysis because [plaintiff] has not shown that the alleged harassment was based upon his status as a male").

environment is hostile can be determined only by "looking at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 21, 23 (1993).

Taylor has not presented evidence of severe or pervasive gender harassment. Cochran called the environment "moderately abusive," but attributed this to some workers' intolerance of homosexuals, not Taylor's gender. (Cochran Dep., p. 31). A "moderately abusive" environment caused by intolerance for someone's sexual orientation is deplorable, but it does not provide the basis for relief under Title VII. Rather, Title VII is violated only when "the workplace is permeated with '*discriminatory* intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris*, 510 U.S. at 21 (internal citations omitted) (emphasis added).[5]

Taylor cites *Williams v. General Motors Corp.*, 187 F.3d 553 (6th Cir. 1999) for the proposition that the standard for sexual harassment does not vary depending on the work environment. This is contrary, however, to what the Supreme Court stated in *Oncale*, where it explained that alleged discriminatory actions cannot be considered in a vacuum:

> We have emphasized, moreover, that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." In same-sex (as in all) harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. . . . The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and

---

[5] See, also, *Harbert-Yeargin*, supra, 266 F3d. at 519 (ruling in favor of employer and stating that "the conduct complained of in many of these sexual harassment cases is so offensive, it is easy to understand that a sense of decency initially inclines one to want to grant relief. . . . [but] Title VII deals with discrimination in the workplace, not morality or vulgarity").

juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. at 81-82.

Taylor argues that physical contact involved in the "groping" by Wayne Harley intensified the severity of his harassment. But that alleged conduct occurred during a 9- or 10-month period over *seven years ago,* in 2000-01. Moreover, Taylor did not complain about Harley's conduct for months and conceded he downplayed the incidents once he finally did complain. (See Taylor e-mail to Trushenski, Ex. 14 to Taylor Dep., at 000260 (stating "I do not hold you in any way accountable for this problem. We only discussed this once in December, and I'm sure I was so vague about it that you did not understand how bad this problem was for me.")).

The next alleged incident about which Taylor complains did not occur until 3½ years later, in December 2004, when Bob Hayes allegedly threw a pair of panties on his desk. Taylor claims that 10 months after that, in October 2005, Hayes confronted him with a mock bloody diaper and "several weeks after" presented him with a mock tampon dipped in imitation blood, which led Taylor to make a complaint about Hayes. (See discussion in S.J. Mem., pp. 4-5).

The "bear hug" incident involving Bob Boice occurred late in 2005, shortly after the last Hayes incident. But that incident had no sexual or gender connotation whatsoever. Taylor testified that Boice was "very gregarious," "would often wrestle with people in the office, and Taylor did not "know what he was getting at" when Boice lifted him off the floor. (Taylor Dep., pp. 157, 159).

These varied, independent and unrelated incidents are neither severe nor pervasive. See *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) (finding that five incidents of

sexual harassment, including three involving physical contact, over a four-year period were not severe or pervasive).[6]  Moreover, according to Taylor's own testimony, he was not singled out to be the object of jokes but was rather treated the same as others:  "[Production workers, such as Bob Hayes] were frequently pulling pranks *on each other*."  (Taylor Dep., p. 151 (emphasis added)).

Moreover, Taylor has failed to show that Fuller did not respond appropriately to his complaints.  In the case of alleged discriminatory harassment of an employee by a coworker, the harassed employee must show the employer both (1) knew or should have known of the harassment, and (2) failed to take prompt and appropriate corrective action.  *Harbert-Yeargin, Inc.*, supra, 266 F.3d at 518; *Smith v. Leggett Wire Co.*, 220 F.3d 752, 760 (6th Cir. 2000).  "[A] a response is adequate if it is reasonably calculated to end the harassment." *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999).

The record in this case demonstrates that Fuller took appropriate and immediate action to stop the misconduct once Taylor reported it to Human Resources.  After Taylor's complaint to Human Resources about Harley, he had no further problems with Harley, and later recommended him for advancement.  (See Taylor Dep., pp. 129-30 (agreeing he had no problem with Harley getting a team leader position in 2006 or 2007 because Harley had not done anything improper to him in a number of years)).  Once Taylor complained about Hayes by name, Human Resources conducted an investigation, Hayes apologized, and Taylor had no further problems in his interactions with Hayes.  (Id., pp. 153-55).

Similarly, after Taylor's report prompted an investigation about the Boice bear hug incident, Boice never bothered him again.  (Id. at 164-65).  In *Ellison v. Daimler-Chrysler Corp.,*

---

[6] Cf. *Williams v. General Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999) (reversing summary judgment in favor of employer where there were fifteen separate allegations of sexual harassment over a one-year period).

2007 U.S. Dist LEXIS 80227 (N.D. Ohio Oct. 30, 2007), in which a female employee similarly complained of being pinned against her workstation by a male co-worker, the court, while recognizing that the incident was physically threatening to the plaintiff, granted the employer's summary judgment motion in part because the employer took necessary steps to prevent the incident from re-occurring.

None of the other incidents Taylor complains of, such as the bestiality drawing on a piece of factory equipment, or co-workers watching explicit videos or R-rate movies at work, had anything personally to do with Taylor, much less with the fact that he is male.  They are irrelevant to his claim.  See Black v. Zaring Homes, Inc., 104 F.3d 822, 826 (6th Cir. 1997) (holding that plaintiffs failed to show the existence of an objectively hostile work environment where most of the alleged discriminatory remarks were not directed at the plaintiff and explaining that "[a]lthough the verbal comments were offensive and inappropriate, and the record suggests that defendant's employees did not always conduct themselves in a professional manner, Title VII was 'not designed to purge the workplace of vulgarity.'").

IV.  **Taylor Has Not Shown Disputed Questions of Material Fact to Avoid Summary Judgment Dismissing His Retaliation Claim.**

Taylor's Amended Complaint alleges that his March 2007 termination came in retaliation for his claims of sexual harassment, his report of OSHA violations and this lawsuit. (Amended Complaint, ¶¶ 22, 27, 29).  Fuller's summary judgment motion shows there were legitimate and non-retaliatory reasons for Taylor's termination.

Taylor's Company-owned laptop computer was examined after the lawsuit was filed as part of Fuller's effort to preserve electronic evidence.  This examination revealed multiple violations of Company policy.   Taylor used Fuller's internet facilities and computer hardware to download pornographic images; conduct a relationship with a "cyber slave;" engage in adult-

theme internet matchmaking activities; and write and transmit to an unsecure email account a lengthy "journal" containing confidential business and customer information from which Taylor apparently intended to write a "tell all" book designed to embarrass Fuller.   (S.J. Mem., p. 12).

Confronted with this evidence, Taylor had the burden of proving by a preponderance of the evidence that the explanations provided by Fuller were not the true reasons for his termination, but rather a pretext for retaliation.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).  Taylor had the burden to prove "more than a dispute over the facts upon which the discharge was based."  *Abdulnour v. Campbell Soup Supply Co., LLC,* 502 F.3d 496, 502 (6th Cir. 2007) (quoting *Braithwaite v. The Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001)).   Taylor was required to present evidence that Fuller did not "honestly believe" in the given reason for Plaintiff's termination.  *Abdulnour,* 502 F.3d at 502.

In opposing summary judgment, Taylor offers no evidence which calls into question in any material way the legitimate explanation for his termination.

**A.      H.B. Fuller's Termination Letter Is Not Direct Evidence of Retaliation.**

Taylor  argues that his March 23, 2007,  termination letter,  which provided the detailed reasons for his termination, (Strasser Dep. Ex. 22), somehow provides direct evidence of retaliation.  Taylor points to a reference in the letter to Taylor's decision not to accept a severance agreement offered "in lieu of termination." [7]   However, Fuller's effort to allow Taylor a face-saving exit rather than termination does not amount to unlawful retaliation.

As shown by the Affidavit of Donald J. Mooney, Jr., filed with Fuller's Summary Judgment Motion, once the offensive materials were found on the laptop computer used by

---

[7] The letter describes four grounds for termination, and is preceded by the statement that "We understand through your new attorney that you do not consider yourself bound by the agreement for severance in lieu of termination that your original attorney had indicated that you had accepted.  As a result, your employment with H.B. Fuller has been terminated effective March 17, 2007."  (Ex. 22 to Strasser Dep.).

Taylor, Fuller offered Taylor the opportunity to resign by signing a Severance Agreement in lieu of termination.[8]  A proposed Severance Agreement was provided to Taylor's counsel, along with a compact disc containing images obtained from the computer Taylor used. (Mooney, Aff. ¶ 7, Exhibits B and C thereto).  While Taylor chose to reject the Severance Agreement,[9] he never denied that any of the materials provided were on the Company computer he used.   Fuller elected to go forward with Taylor's termination, because of the material found on his Company-issued computer, as it said it would do when the Severance Agreement was tendered.[10]

Taylor's termination under these circumstances does not provide direct evidence of retaliation.  If it did, no employer would ever offer a severance agreement to an employee in lieu of termination because, if the employee rejected the offer, any subsequent termination would be viewed as "retaliation."  The issue is not whether Taylor was fired because he rejected the agreement, but the legitimate basis for termination at the time Fuller offered the agreement.

Taylor improperly relies on *Christopher v. Stouder Mem'l Hosp.,* 936 F.2d 870, 879 (6th Cir. 1991), in contending that the termination letter's reference to Taylor's rejection of the severance agreement was direct evidence of retaliation.  In *Christopher,* the plaintiff alleged retaliation, claiming that a hospital had denied her nursing privileges because she had once sued another hospital for sex discrimination.  The Court found there was direct evidence of retaliation based on testimony that two of the defendant's administrators had referred to her earlier lawsuit

---

[8] The Company's personnel policies specifically provide for offers of severance in lieu of termination as part of the discipline process, if an employee signs a release of claims against the Company.  (Strasser Dep. Ex. 21, p. 00579).

[9] Geoff Damon, counsel for Taylor, initially indicated that Taylor would accept a revised severance agreement. When Taylor decided not to sign the severance agreement, he hired new counsel.

[10] As indicated in Mr. Mooney's March 14, 2007 letter to Mr. Damon, "all of this information provides ample basis for the termination of Mr. Taylor if he chooses not to resign."  Mr. Mooney's Affidavit indicates that he told Mr. Damon "that absent a resignation, Plaintiff's termination was likely because of Plaintiff's violation of company technology and confidentiality policies." (Mooney Aff. ¶ 9).  In essence, Taylor was given the chance to avoid the stigma of a termination and to receive a significant amount of severance pay in lieu of termination.

in explaining the denial of privileges.  Meeting minutes where the plaintiff's privilege application was discussed raised the issue of her prior discrimination suit.  936 F. 2d at 879.

In contrast, Fuller's reference in the termination letter to the severance agreement was simply a factual acknowledgement that the Company had given Taylor an opportunity to avoid termination by resigning.   See, e.g., *EEOC v. Sundance Rehabilitation Corp.*, 466 F.3d 490 (6th Cir. 2006) (offering severance agreement to employees being eliminated in workforce reduction did not amount to retaliation); *Dorn v. General Motors Corp.*, 131 Fed. Appx. 462 (6th Cir. 2005) (release waiving all legal claims against employer in return for severance bonus under attrition plan was valid).  Such an offer is not direct evidence of retaliation.  If it was, as stated above, no employer would ever be able to offer an employee a face saving alternative to termination without risking a retaliation claim.

### B.    Taylor's January 30, 2007 Verbal Warning Was Not Retaliation.

Though there is no reference to it in the Amended Complaint, Taylor now argues that a January 30, 2007 verbal warning was a separate act of retaliation. (Pl.'s Br., p. 34-35).  Because that verbal warning was not referred to in the Amended Complaint as an incident of retaliation, Fuller did not discuss it in its Motion.  Since Taylor now relies on this warning, the Court must consider all of the relevant facts, including the Supplemental Declaration of Susan Anderson, attached hereto, that discusses that incident.

In a December 19, 2006, journal entry, Taylor claims he witnessed an argument between two management team colleagues over the operation of some equipment.  According to Taylor's journal, the two colleagues were examining an equipment manual.  "Boice took the instruction manual and started to draw on it as an aid to making his point. At this point Shoemaker said "[D]on't draw on that. You mess this up and I will kill you." (Taylor Dep., Ex. 12, p. 000618).

Taylor characterized this as a "death threat," but chose to wait three days until December 22, 2006, to report it to Frank Strasser and Human Resources Manager Susan Anderson (Strasser Dep. Ex. 34;  Taylor Dep., pp. 319-23).  In the meantime, he reportedly told subordinate employees that Shoemaker had threatened to kill Boice, causing a rumor of potential mayhem to spread through the plant.  Boice, the "victim" of this death threat heard about the rumor Taylor was spreading and contacted Anderson to tell her he was not threatened by Shoemaker and that Taylor was up to no good.  (Anderson Supp. Dec., ¶ 4 and Ex. A).

When Taylor made his report on December 22, 2006, Anderson investigated by interviewing the participants.  Anderson's January 4, 2007, report shows that both Shoemaker and Boice saw the conversation as a simple good-natured, joking exchange between colleagues, hardly a threat worth spreading around the plant. Boice characterized the "threat" alleged by Taylor as "just joking banter." (Anderson Supp. Dec., ¶ 4, Ex.A, p. 1). Anderson concluded her investigative report with the following recommendation:

> Bar none, every witness I spoke with – the witness, the alleged victim, and the alleged perpetrator – all knew the comment was made in jest. Bar none, they all knew there was no real threat implied in the statement.
>
> I think Frank has adequate documentation (mid-year, year end documents and signed discussion dated 5/17/06) with regard to expectations of Sam in such instances – either intervene or coach, or report the incident in a timely manner. Sam failed to do either of these things.  My recommendation is a verbal warning for failure to respond to this incident in accordance with both our policy, as well as previous direction given to Sam.

(Anderson Supp. Dec., Ex. A).

On January 30, 2007, Strasser and Anderson met with Taylor to give him a verbal warning.  This warning, which caused no financial harm to Taylor, was based solely on the December 2007 event, and had no causal connection to Taylor's assertion of his Title VII rights. On its face, Taylor's characterization of joking banter as a "death threat" in an apparent attempt

to create conflict at the Blue Ash facility justified the mild verbal warning he received.  Taylor

has not met his burden of showing that this evidence was a pretext for retaliation.

Plaintiff also argues that the January 30, 2007, verbal warning was a pretext for

retaliation because purportedly comparable employees – Ed Shoemaker and Bob Boice – had not

"reported the death threat before Taylor, but were not disciplined for failure to timely report."

(Pl.'s Br., p. 34-35).  In fact, Boice did report the incident two days *before* Taylor, on December

20, 2007.  (Anderson Supp. Dec., ¶ 4).  More importantly, neither Boice nor Shoemaker saw

their joking as a "threat" which needed to be reported.  (Id., ¶ 4, Ex. A).

Even if Taylor could establish some causal connection between his lawsuit and the

warning, a mere verbal warning does not amount to an actionable adverse action constituting

retaliation.  In order to be actionable, an adverse action must be "likely to chill the exercise of

constitutionally-protected speech."  *Stavropoulos v. Firestone,* 361 F.3d 610, 618 (11th Cir.

2004).  The Supreme Court has characterized the anti-retaliation provision of Title VII as

protecting an individual only from retaliation that produces injury or harm.  *Burlington Northern*

*& Santa Fe Ry. Co. v. White,* 548 U.S. 53, 67 (2006).  The verbal warning  caused no harm to

Taylor and had no relationship to his exercise of Title VII rights.

**C.     Taylor Has Not Shown Credible Evidence to Establish That Fuller's Stated Reasons for His Termination Were a Pretext for Discrimination.**

The Sixth Circuit has held that "once the employer has come forward with a non-

discriminatory reason for firing a plaintiff, we hold that the plaintiff must produce sufficient

evidence from which the jury may reasonably reject the employer's explanation."  *Manzer v.*

*Diamond Shamrock Chem. Co.,* 29 F. 3d 1078, 1083 (6th Cir. 1994).  The Court identified three

ways to meet this burden: "the plaintiff is 'required to show by a preponderance of the evidence

either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not

*actually* motivate his discharge, or (3) that they were insufficient to motivate discharge.'" Id. at

1084, (quoting *McNabola v. Chicago Transit Auth.,* 10 F. 3d 501, 515 (7th Cir. 1993)) (emphasis

in original).

   In this case, Taylor has presented no credible evidence that the materials found on

Fuller's computer were not there, were not sufficient grounds to terminate a company manager,

or did not actually motivate the Company's decision to terminate Taylor.  Taylor does not deny

using his Company computer to draft correspondence to his "cyber-slave;" to view improper

images; or to visit during work hours "bodybuilding" websites featuring teens and men in states

of undress.  Taylor does not deny that he created and sent to an outside e-mail address a 300-plus

page "journal" containing confidential customer and product information, as well as disparaging

rants about his bosses and his employer, after threatening to write a "tell-all" book about Fuller

unless he was paid off with more than $1 million. (See discussion S.J. Mem., pp. 12, 23).

Taken together, or looked at separately, those acts amply justified Taylor's termination, and

violated a variety of Company  Performance Corrective Action Procedures/Guidelines.[11]

   Despite the obvious justification for his termination shown by this undisputed evidence,

Taylor points to several factors in arguing that the stated grounds for his termination were a

pretext for retaliation:

   ●  **The computer "search."**   Taylor's claim that the computer search evidences pretext

is refuted by the fact that, under Civ. R. 26, the Company was obligated to preserve electronic

---

[11]  H.B. Fuller has established performance corrective action procedures/guidelines that describe the types of violations that can lead to discipline and/or termination.  (Strasser Ex. 21).  Among the violations which apply to Taylor's conduct are "flagrant" violations, such as "disclosure of confidential information or records to unauthorized persons" (his transmittal of Company information to an outside email account and the threat to write a "tell-all" book with that information); "gross insubordination (e.g., refusing a work assignment, belligerent language, etc.)" as evidenced by the disparaging and hostile language in his journal about the Company and its management; "offensive or indecent personal conduct" as evidenced by the types of materials he downloaded onto, viewed and transmitted from his Company computer.  Among the "serious violations" listed in the policy are "misusing any Company or employee property," as evidenced by the misuse of the Company's computer system.  (Strasser Dep. Ex. 21).

evidence, and knew that the computer Taylor used contained relevant evidence.  (Anderson Aff.
¶ 17; Taylor Dep., p. 67).  Prior to that, Taylor had only selectively disclosed portions of his
journal to management at an EEOC mediation, and to a Fuller attorney who investigated one of
his complaints (Anderson Aff. ¶ 14, Taylor Dep. Ex. 12, p. 000452).  Taylor elected to use a
Company computer to create his journal, to "surf" for, download and store objectionable
material, and to correspond with his "cyber-slave."  An employee does not have a reasonable
expectation of privacy with respect to use of a company computer or internet service when the
company has an express policy that it may monitor computer use.[12]  See, e.g., *Guest v. Leis*, 255
F.3d 325, 333 (6th Cir. 2001) (citations omitted) (finding no privacy interest where employer
posted privacy disclaimer regarding computer files).   Nor does the company engage in
"retaliation" when it complies with its obligations under the Federal Civil Rules, or when it looks
for evidence relevant to a lawsuit begun by the employee.

- **Company Managers did not have to study and review Company policies in
deciding to terminate Taylor.**  Taylor complains that Company executives involved in the
decision to terminate him,[13] did not study Company policies or individually examine the
contents of his computer in detail before collectively making the decision to terminate him.  But
there is no reason to suggest that these experienced managers did not have sufficient knowledge
of company policies before deciding to terminate Taylor.  Lawful termination is not dependent
on a manager citing chapter and verse of the company policy that forbids improper use of
company computer resources, such as transmitting confidential customer and product
information out of the company in a "journal."  Nothing in the testimony suggests that these

---

[12] See Fuller's Information Technology Policies at 00613, 00619, Ex. 3 to Taylor Dep. (stating that Fuller "reserves the right to monitor all e-mail communication" as well as  "the user's activity within the Internet environment.").

[13] These include Frank Strasser, Plant Manager; Susan Anderson, HR Manager; and Senior Manager Todd Trushenski.

senior managers were not sufficiently aware of their company's policies and were required to "look it up."  Fuller's policies which Taylor violated are part of the record.  (See policies cited in footnote 13, <u>supra</u>). Likewise, company managers were entitled to rely in good faith on the descriptions of their HR Manager and in-house counsel concerning the objectionable material found on Taylor's computer, without personally examining it .

●  **Recognition of the Legal Obligation to Avoid Retaliation Is Not Evidence of Retaliation.**  Taylor argues that, in deciding whether to terminate him, managers discussed their concern that their decision <u>not</u> constitute or be perceived as retaliation.  There is no evidence, however, that such discussions were marked by retaliatory animus.  <u>See</u> *Zhuang v. Datacard Corp.*, 414 F.3d 849 (8th Cir. 2005) (holding that supervisors' acknowledgement that they discussed plaintiff's EEOC claim when selecting employees for termination did not establish retaliation when non-discriminatory reasons existed for the termination and stating that an employee cannot "insulate herself from an otherwise valid termination by filing an EEOC complaint").  Considering Taylor already had a pending lawsuit, which included a retaliation claim, it is only natural that managers were concerned that *any* disciplinary decision might be mischaracterized as retaliation, regardless of the facts underlying the decision.  Their commitment to assuring that their decision was based on supportable facts is *not* evidence of retaliation.  If anything, it shows that Fuller took all necessary steps to make sure its decision was lawful.

●  **There are no comparable Fuller employees who received preferable treatment.**
Taylor claims other employees engaged in comparable misconduct but have not been disciplined.
To be appropriate comparators, fellow employees must be "similarly situated in all aspects."
*Holifred v. Reno*, 115 F.3d 1555, 1563 (11th Cir. 1997).  "The comparators must be nearly

identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1091 (11th Cir. 2004). In this case, neither the "comparators" nor the circumstances are "nearly identical." Taylor claims he reported instances of co-worker misbehavior,[14] where no disciplinary action was taken. The evidence shows, however, that Taylor reported these incidents generally months, if ever, after the incidents occurred.[15] When no timely report is made the ability of the Company to promptly and fairly warn or discipline an employee is compromised.

Further, Taylor's delay or failure to report misconduct contravened his managerial responsibility to act promptly when he saw conduct he believed violated Company policy. Taylor had the authority and duty to instruct employees to refrain from conduct violating Fuller's policies on harassment or computer use. (Taylor Dep., p. 24 Anderson Aff. ¶ 4, Ex. A). Instead, he secretly recorded these incidents in his journal for use later, either in this litigation or in his "tell-all" book about the Company.

These employees and incidents are not comparable for the purpose of showing pretext. All but Mr. Bellman were hourly paid, non-management employees. (Anderson Supp. Dec. ¶ 11). Expectations are considerably higher for management employees such as Taylor. The incidents were isolated and remote in time when Taylor finally reported them, and not

---

[14] Taylor cites instances where he saw Cheryl Davis and other female employees watching a video of a naked woman playing the piano with her legs; co-worker Steve Bellman allegedly watched a "sex scene on his work computer from the animated Claymation movie 'American Ranger;'" Dennis Judd reportedly viewing an image of a drunken, naked woman on his work computer; Kevin Seymour viewing pictures of naked women on his work computer; and Gregg Campbell playing the "rape scene" from "Deliverance" for other employees.

[15] Taylor's Journal entry for March 2, 2006 says that he saw Kevin Seymour watching "porno on the internet in the lab. I cleared my throat and he stopped." (Taylor Dep. Ex. 12, p. 406). There is no evidence that he ever reported this incident to management. The reference to Cheryl Davis and other women watching an offensive video appears on a January 18, 2006 entry in Taylor's Journal. (Taylor Ex. 12, p. 398). That incident was not reported by Taylor until March 27, 2006 (Anderson Supp. Dec. ¶ 10). The instances when Boice showed an objectionable image and employees watched excerpts from "Deliverance" occurred in 2004 but were not reported until more than a year later. (Taylor Dep., p. 164-67)

comparable to the multiple infractions itemized with respect to Taylor.  For any of these employees to be a comparator "the comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  *Silvera v. Orange Co. School Bd.,* 244 F.3d 1253, 1259 (11th Cir. 2001).

In attacking  the credibility of Fuller's explanation for his termination, Taylor had the burden of presenting "substantial evidence supporting a reasonable disbelief of the employer's explanation" for the termination.  *Imwalle v. Reliance Med. Prod.,* 515 F. 3d 531, 551 (6th Cir. 2008).  Taylor has not met that burden, and therefore his claim of retaliation should be dismissed.

**V.     Conclusion**

The record in this case demonstrates there are no disputed issues of material fact, and summary judgment should be granted in favor of the defendant as a matter of law.


Respectfully submitted,

/s Donald J. Mooney, Jr.
Donald J. Mooney, Jr.(0014202), Trial Attorney
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202
513-698-5070; 513-698-5071 (Fax)
dmooney@ulmer.com

OF COUNSEL:
Pamela K. Ginsburg (0071805)
Ulmer & Berne LLP
600 Vine Street, Suite 2800
Cincinnati OH 45202
Tel: (513) 698-5020; Fax: (513) 698-5021
pginsburg@ulmer.com

Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

The foregoing is being filed electronically and will be served via the Court's electronic filing and notification system upon Marc D. Mezibov, Attorney for Plaintiff, 401 E. Court Street, Suite 600, Cincinnati, Ohio 45202 on June 27, 2008.

/s Donald J. Mooney, Jr.

516590v1
33186.00001