**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

SIDNEY WATTS TAYLOR

    Plaintiff,

Case No. 06cv854

Judge Michael R. Barrett

v.

H.B. FULLER COMPANY

    Defendant.

## <u>ORDER</u>

I.    **INTRODUCTION**

This matter is before the Court on the Defendant's motion for summary judgment (Doc. 21).   Plaintiff has responded (Doc. 44) and Defendant has replied (Doc. 47).   Also, before the Court is Plaintiff's motion to strike the Affidavit of Jeremy Wunsch (Doc. 40). Defendant responded (Doc. 43) and Plaintiff replied (Doc. 46).

II.    **FACTUAL BACKGROUND**[1]

Taylor's discrimination claim is predicated upon his assertion that he was discriminated against not because of his sexual orientation, but because he was perceived by his co-workers as being "insufficiently 'manly' enough in his carriage and demeanor" (Doc. 44, p8).

---

[1]Given that the facts are to be viewed in a light most favorable to the non-moving party, these facts are derived primarily from the Plaintiff's memorandum in opposition to Defendant's motion for summary judgment (Doc. 44) and Plaintiff's Amended Complaint (Doc. 5).

Plaintiff, Taylor, began working for H. B. Fuller ("Fuller") in 1979 at its Louisville facility. In January of 2000, after over 20 years of service, Taylor accepted a transfer to the Blue Ash location to serve as the facility's technical manager. Prior to the filing of this lawsuit, Taylor had never been disciplined in any manner during the course of his 20 plus year career with Fuller. In addition, Taylor's annual performance evaluations consistently indicated he was performing at a satisfactory level or better and he was awarded the Circle of Excellence honor on six occasions.

Taylor claims that he was subject to pervasive and unwelcome discrimination for being too feminine. For example, Wayne Harley groped, "humped" and otherwise inappropriately touched Taylor on at least six different occasions beginning in mid-2000. Taylor Depo. 95, 107. On one occasion, Harley grabbed Taylor's genitals and butt. Id. at 98-99. On another occasion, Harley placed his arms around Taylor from behind and simulated a sexual act by rubbing his genitals against Taylor's backside. Id. at 99, 105. Taylor first reported this inappropriate behavior to his supervisor, facility manager Todd Trushenski, in December 2000. Id. at 99, 106. Contrary to the company's policy as set forth in the Sexual Harassment and Discrimination Policy, Trushenski did not take the complaints seriously, nor did he investigate the allegations made by Taylor. Id.

In February 2001, another incident occurred where Taylor was assaulted by two co-workers, one of whom was Harley, who approached Taylor from different sides and began humping, groping and touching Taylor. Id. at 100. Taylor had to physically throw the men off of him. At that point Harley asked Taylor if he was "switching sides." Id. at 101, 141. Unhappy with how Trushenski handled his prior complaints, Taylor choose to go above him and report the incident to Chuck Smith, the corporate human resources

director, the following month at a training seminar in Minnesota. Id. at 108. Smith investigated the allegation and determined that it did, in fact, occur. In response, Smith moved Wayne Harley to a different shift for one month and required all employees to review a training video. Smith Depo. 45-50. No other action was taken.

After Smith's investigation, Taylor no longer felt comfortable working at the Blue Ash facility and requested a transfer. However, Taylor was never transferred or interviewed for any other positions, despite his applications. Taylor Depo. 125-127.

In 2004 and 2005 the harassment continued. In December 2004, a pair of women's panties was thrown onto Taylor's desk. Taylor believes that Bob Hayes, another co-worker, threw the panties as Taylor saw him walking away from his office. Id. at 132-133. Taylor reported the incident to Frank Strasser, Trushenski's replacement, who declined to investigate the incident. Id. at 135-136. Then, in October, 2005,. Hayes approached Taylor holding a diaper filled with what appeared to be blood and asked Taylor if it was his or if it belonged to "some chick." Id. at 147. Several weeks later, Hayes placed a "bloody" tampon on Taylor's desk and attempted to rub it on Taylor after Taylor tried to throw it away. Id. at 144-146.

This incident was reported to Strasser as well as to Susan Anderson, the regional human resources director. Id. at 149. Anderson conducted an investigation, concluded the incident occurred and that it was inappropriate. Id. at 153. Hayes was required to apologize to Taylor and ordered to undergo "guidance," the lowest form of discipline. Strasser Depo. 32, 37. All employees were also required to attend a harassment training program conducted by Anderson. Taylor Depo. 156. Immediately following the completion of the training program, Bob Boice, another manager, grabbed Taylor from

behind and picked him up, holding him in the air for five to ten seconds.   Id. at 156-157.

Taylor again reported the incident to Anderson and Strasser and reiterated how this treatment was taking a serious toll on his mental and physical health.   Id. at 160-161.

Boice was giving a verbal warning.   Strasser Depo. 104.

In addition to the above assaults, Taylor was also shown inappropriate or pornographic images by his co-workers or witnessed his co-workers viewing such images, including witnessing co-workers repeatedly watching the male-on-male rape scene from *Deliverance*.   Taylor Depo. 158, 170-172, 199-200.   Another co-worker, Dave Cochran, testified that the work environment for Taylor was "abusive" and "intolerable."  Cochran Depo. 31.   He and Taylor both testified that Taylor was verbally harassed on a weekly basis.   Id. at 29-30; Taylor Depo. 95, 107, 144.

In February, 2006, Taylor filed a charge of discrimination with the EEOC and also filed an anonymous complaint with OSHA regarding several safety concerns that existed at the facility.   See Doc. 44, Exh. F1 and F2, Taylor Depo. 176-178.   OSHA investigated and issued eleven citations and a fine of $8,000 against H.B. Fuller.   Taylor Depo. 191.

Prior to filing the OSHA complaint, Taylor reported these concerns to his superiors who refused to address the issues.   Eventually, it became known to Fuller that Taylor made the complaint to OSHA.

Strasser advised employees that no bonuses would be given because of the complaint to OSHA.   Strasser Depo, 70.   Obviously, this angered the employees.   One employee, Dennis Judd, told Taylor that "whenever he finds out who the whistleblower was, he will take him off site and teach him a lesson."  Taylor Depo. 337.   Taylor's car was then vandalized with spray paint in the parking lot on several occasions.   Id. at 96.

Despite reporting these incidents, nothing meaningful was done.

On June 13, 2006 Taylor entered his office to find a newspaper clipping lying on the floor. The article was a commentary on gay marriage and had the words "DIE OSHA FAG" written across it in large red letters. See Doc. 5, Exh. 6. Taylor reported this incident to Anderson and Strasser and was encouraged to file a police report. H.B. Fuller sent an attorney to Blue Ash to investigate but such investigation was deemed "inconclusive". Taylor Depo. 20-209, 218.

In December, 2006 the instant action was filed. Several weeks later, Fuller seized Taylor's computer and made a "mirror image" of the hard drive. Taylor Depo. 329-330. Then, in January 2007, Taylor witnessed a dispute between two co-workers wherein one, Edward Shoemaker, threatened to kill Bob Boice if he drew on the instruction manual. Taylor reported the incident to Anderson and Strasser a few days later. Neither Shoemaker nor Boice reported the incident. Three weeks later, Strasser disciplined Taylor for failing to report the incident in a timely manner. Interestingly, neither Shoemaker nor Boice were disciplined for failing to report the incident, nor were they disciplined for the incident itself. See Doc. 44, Exh. I; Strasser Depo. 45, 55-58.

Taylor, with his then counsel, engaged in settlement discussions with Fuller in February 2007. Once those discussions broke down, Fuller hired an outside computer expert to view the "mirror image" of Taylor's computer. It was at this point that Fuller discovered pornographic images on Taylor's company issued computer. Upon discovery of the images, several conferences were held to determine if there were sufficient grounds to terminate Taylor. At the same time, Taylor hired new counsel who informed Fuller that it would not approve any settlement that had been previously

discussed with Taylor's former counsel.

Taylor was then terminated. He was informed that as a result of his failure to accept the severance package they had offered, he was terminated immediately. Fuller also cited alleged violations of company policies including confidentiality obligations, failing to report actions which violated company policy and alleged disrespect for the company.

III.     LEGAL ANALYSIS

A.     Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id.* at 252.

In ruling on a motion for summary judgment (in other words, in determining

whether there is a genuine issue of material fact), "[a] district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also *L.S. Heath & Son, Inc. v. AT&T Information Sys., Inc.,* 9 F.3d 561 (7th Cir. 1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir.), cert. denied, 506 U.S. 832, 121 L. Ed. 2d 59, 113 S. Ct. 98 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ..."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties." *Beatty v. UPS,* 267 F. Supp. 2d 823, 829 (S.D. Ohio 2003).

B.      Sex Discrimination/ Hostile Work Environment

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).   As clearly set forth in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986), this language "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment," which

includes requiring people to work in a discriminatorily hostile or abusive environment. *Id.*, at 64, *quoting Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 707, n.13, (1978) (some internal quotation marks omitted); *see also Harris v. Forklift Sys.*, 510 U.S. 17, 21 (U.S. 1993).

In order to establish a prima facie case of sex discrimination under Title VII, a plaintiff must show (1) that he is a member of a protected class, (2) that he was subject to an adverse employment decision, (3) that he was qualified for the position, and (4) that he was treated differently than a similarly situated individual outside the protected class. *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004). In order to bring a hostile work environment sexual harassment claim, a plaintiff must show the following: (1) the employee was a member of a protected class; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the existence of employer liability. *Clark v. UPS*, 400 F.3d 341, 347 (6th Cir. 2005).

Both sides agree that discrimination and/or harassment on the basis of sexual orientation is not actionable under Title VII. *See Dillion v. Frank*, 952 F.2d 403 (6th Cir. 1992). However, Plaintiff, relying on *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235, 250-251 (1989), alleges that discrimination and/or harassment on the basis of sex stereotyping can create a colorable claim under Title VII. See also *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004). The Supreme Court in *Price Waterhouse* held that Title VII protected a female who failed to conform to social expectations of how a woman should look and behave. *Id.* The employee in *Price Waterhouse* was denied partnership, in part, because she was considered "macho" and was told that her chances would

improve if she were to take "a course at charm school," "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled and war jewelry." 490 U.S. at 235   In other words, sex stereotyping is discriminating against a woman because she failed to act like a woman.   Or, as in *Smith*, discriminating against a man because he failed to act like a man.   Smith was a male lieutenant in the city fire department who had been diagnosed with Gender Identity Disorder.   After his diagnosis, Smith began expressing his feminine tendencies more openly.   His co-workers noticed this change and began commenting that he was not "masculine enough."   Smith then informed his supervisor of his diagnosis and informed him that his treatment would eventually include a complete physical transformation from male to female.   The supervisor took this information to the fire chief who arranged a meeting in an attempt to terminate Smith.   The district court found that Smith's claim was actually one based upon his transsexuality and that such claim is not protected by Title VII.   *Smith v. City of Salem*, 378 F.3d at 571.   The Court of Appeals disagreed, holding that "[s]ex stereotyping based upon a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior; a label such as 'transsexual,' is not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender non-conformity."   378 F.3d at 575.

In the case at hand, the question then becomes was Taylor discriminated and/or harassed because of his sex.   Was it because he failed to act masculine enough and thus, entitled to Title VII protection?   Although the harassment was deplorable, unfortunately, the answer is no.

Fuller cites to *Vickers v. Fairfield Medical Center*, 453 F.3d 757 (6th Cir. 2006) to

support its argument that it is entitled to summary judgment.   *Vickers* is factually similar to the case at hand.   Vickers was a private police officer who was harassed by three co-workers, one of whom was his supervisor.   These co-workers made sexually based slurs and discriminating comments about him, they alleged that he was homosexual, questioned his masculinity, and wrote "FAG" on his reports.   Vickers was physically assaulted as well.   On one occasion he was handcuffed and then one of the co-workers simulated sex with Vickers while another co-worker photographed the incident.   On other occasions, his co-workers repeatedly would touch his crotch with a tape measure and grab his chest.   They also tried to shove a sanitary napkin in his face.

Victors filed a charge of discrimination with the EEOC and received a right to sue letter.   Then Vickers filed a complaint alleging sex discrimination, sexual harassment and retaliation in violation of Title VII.

The Court found that Vickers did not argue that his appearance or mannerisms on the job were perceived as gender non-conforming or that his appearance or mannerisms were the cause of the harassment he experienced.   Instead, the harassment was based upon Vickers' perceived homosexuality.   Such is the case in the present matter.   Taylor does not allege that his appearance or mannerisms were perceived as feminine.

The Court in *Vickers*, quoting the Second Circuit in *Dawson v. Bumble & Bumble*, 398 F.3d 211, 218 (2d Cir. 2005), noted:

> When utilized by an avowedly homosexual plaintiff, . . . gender stereotyping claims can easily present problems for an adjudicator. This is for the simple reason that stereotypical notions about how men and women should behave will often necessarily blur into ideas about heterosexuality and homosexuality.  Like other courts, we have therefore recognized that a gender stereotyping claim should not be used to bootstrap protection for sexual orientation into Title VII. *Id.* (internal quotation marks  citations, and

alteration omitted).

*Vickers v. Fairfield Med. Ctr.*, 453 F.3d at 763-764.   The Court in *Vickers* went on to hold that "[u]ltimately, recognition of Vickers' claim would have the effect of *de facto* amending Title VII to encompass sexual orientation as a prohibited basis for discrimination.   In all likelihood, any discrimination based on sexual orientation would be actionable under a sex stereotyping theory if this claim is allowed to stand, as all homosexuals, by definition, fail to conform to traditional gender norms in their sexual practices."   *Id.* at 764.

Thus, Taylor's claim of sex stereotype discrimination must fail as he is not a member of a protected class.

As to Taylor's claim of a hostile work environment due to same-sex sexual harassment, this too must fail.   Although same-sex sexual harassment claims can come under the umbrella of Title VII protection, the actions in this matter do not.   "Title VII does not prohibit all verbal or physical harassment in the workplace, it is directed only at '*discrimination* … because of… sex.'"   *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998).   As set forth in *Oncale, supra*, there are three ways a male plaintiff could establish a hostile work environment claim based on same-sex harassment: (1) where the harasser making sexual advances is acting out of sexual desire; (2) where the harasser is motivated by general hostility to the presence of men in the workplace; and (3) where the plaintiff offers "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."   *Id.* at 80-81.   A plaintiff must "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimination* … because of … sex.'"   *Id.* at 81.   Here, there are no questions of fact that exist for a jury.   Taylor has presented no evidence that his

11

harassers were motivated by sexual desire or by hostility towards men in the workplace. Nor has Taylor presented any evidence of how women were treated in the work place. *See Vickers*, 453 F.3d at 765; *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 519-523 (6th Cir. 2001). Thus, Taylor cannot show that the harassment was based on sex.

This Court finds the actions of Taylor's co-workers to be deplorable and unacceptable in today's workforce, however, the result here is required by precedent. Unfortunately, "Congress has not yet seen fit... to provide protection against such harassment." *Bibby v. Phila. Coca-Cola Bottling Co.*, 260 F.3d 257, 265 (3rd Cir. 2001).

C.    Retaliation

Section § 2000e-3(a) provides in relevant part as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

2 U.S.C. 2000e-3(a) (1994). Thus, this section prohibits an employer from retaliating against an employee who has "opposed" any practice by the employer made unlawful under Title VII; and prohibits an employer from retaliating against an employee who has "participated" in any manner in an investigation under Title VII. *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989); *see also Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 791-92 (6th Cir. 2000). A plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or circumstantial evidence from which a jury may infer a discriminatory motive. *Rallins v. Ohio State University*, 191 F.Supp.2d 920, 928 (S.D. Ohio 2002), *citing*, *Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348-49 (6th Cir.1997).

Direct evidence of discrimination occurs when either the decision-maker or an employee who influenced the decision-maker made discriminatory comments related to the employment action in question. *See Reeves v. Sanderson Plumbing*, 530 U.S. 133, 152 (2000), *Ross v. Campbell Soup Co.*, 237 F. 3d 701, 707-08 (6th Cir. 2001). Direct evidence "is evidence which if believed, would prove the existence of a fact . . . without any inferences or presumptions." *Lautner v. American Tel. and Tel. Co.*, 1997 U.S. App. LEXIS 1267, No. 95-3756,(6th Cir. Jan. 22, 1997). For example, racial slurs or comments constitute direct evidence that a termination may have been racially motivated. *See Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1249 (6th Cir. 1995).

In the present matter, Taylor argues that his termination letter is an example of direct evidence of retaliation. The relevant section of the letter states as follows: "We understand through your new attorney that you do not consider yourself bound by the agreement for severance in lieu of termination that your original attorney had indicated you had accepted. As a result, your employment with H.B. Fuller has been terminated effective March, 17, 2007." See Doc. 44, Exh. K. Plaintiff argues that a reasonable jury could find that Fuller terminated Taylor's employment, at least in part, because he refused to accept the settlement that had been offered to him and dismiss his complaint. However, the termination letter does not reference the complaint in this case, the case itself, or any other protected activity. At the time this letter was written, Fuller had found inappropriate images on Taylor's computer and other violations of company policy. Fuller asserts that it was these images and violations that caused Fuller to offer Taylor a severance in lieu of being terminated as allowed by its personnel policies.

The Court does not find that the termination letter is direct evidence of a retaliatory

motive because such remarks require a factfinder to draw further inferences to support a finding of discriminatory animus.

Since direct evidence cannot be shown, Taylor has the burden of proving a *prime facie* case of retaliation on circumstantial evidence. This is done by establishing four elements: (1) the plaintiff engaged in an activity protected by Title VII; (2) the defendant knew that the plaintiff exercised his or her rights; (3) the defendant took an employment action against the plaintiff that a reasonable employee would have found materially adverse; and (4) there was a causal connection between the protected activity and the adverse employment action. *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004). "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met. Once a prima facie case is established, the burden of producing some non-discriminatory reason falls upon the defendant. If the defendant demonstrates such, the plaintiff then assumes the burden of showing that the reasons given by the defendant were a pretext for retaliation." *Id.* (internal citations and quotations omitted).

The Supreme Court has defined what constitutes an adverse employment action in the retaliation context. *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). In *Burlington N.*, the Supreme Court held that an adverse employment action is any action, which might dissuade "a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotations omitted). The Court noted that the adverse employment action standard was to be objective and that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children." *Id.*

Fuller does not dispute, for purposes of this motion, that Taylor engaged in

14

protected activity and that it knew that Taylor exercised his rights. Also, Fuller does not dispute that termination is an adverse action. However, there is a dispute as to whether or not the verbal warning Taylor received for failing to report an alleged death threat in a timely manner is an adverse action. There also is a dispute over whether there is a causal connection between the protected activity and the adverse employment action.

As to the verbal warning, Taylor cites to *Campbell v. Univ. Of Akron*, 211 Fed. Appx. 333,350 (6th Cir. 2006) to support his contention that a verbal warning is an adverse action. However in *Campbell*, the defendant conceded that the verbal warning was an adverse action. There is no such concession in this matter. Additionally, Taylor cites *Halfacre v. Home Depot, U.S.A., Inc.,* 221 Fed. Appx. 424, 432 (6th Cir. 2007) contending that it indicates that something as minor failing to invite an employee to lunch might be sufficient to be an adverse action. However, the Court in *Halfacre* was merely quoting the Supreme Court in *Burlington N.* who, in discussing that an adverse action must be viewed in context, stated, "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Burlington N.,* 548 U.S. at 69 *citing* 2 EEOC 1998 Manual § 8, p 8-14.

Here, there is no evidence of any injury or harm. *See Burlington N.*, 548 U.S. at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.). Taylor's pay was not reduced as a result of this verbal warning and there is no evidence that this verbal warning would have had a

detrimental effect on his career.   Summary judgment is appropriate as to this claim since receiving this type of verbal warning would not prevent a reasonable worker from making or supporting a discrimination claim.   Thus, it is not an adverse action.

However, since Taylor's termination is an adverse action, the Court must determine if the termination has a causal connection to Taylor's protected activities.   For the reasons set forth below, the Court finds that a question of fact exists as to this issue.

"To establish the element of causal link a plaintiff is required to proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action.   Accordingly, at the *prima facie* stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." *Nguyen v. City of Cleveland,* 229 F.3d 559, 565-566 (6th Cir. 2000)(internal cites omitted) *citing   EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir. 1997).   Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *Id.* at 563.

Although a year had passed since Taylor first engaged in protected activities, he continually engaged in protected activities and was terminated approximately three months after the complaint in this matter was filed.   Furthermore, Taylor has shown sufficient evidence that other employees violated the same or similar policies without facing any discipline, let alone termination.   Thus, there is a question of fact as to the

causal connection.

Fuller contends to have terminated Taylor due to various violations of its policies, including improper personal use of the company computer, violating his confidentiality obligations, failing to report violations of company policies and disrespect for the company. Plaintiff, for purposes of this motion, does not dispute that Fuller has offered a legitimate, non-discriminatory reason for his termination. The Court agrees, thereby shifting the burden back to Plaintiff to show that the reasons given by the Defendant were not the true reasons but were instead pretext for discrimination.

The plaintiff may prove pretext by showing either that: (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the adverse action, or (3) the proffered reason was insufficient to motivate the adverse action. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Plaintiff argues that he can show the second and/or third element of the *Manzer* test. To be successful on the second element, i.e., that the proffered reason did not actually motivate the adverse action, Taylor must show that retaliation was a more likely motivation for his termination than the reasons set forth by Fuller. *See Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 549 (6th Cir. 2008) *citing Manzer*, 29 F.3d at 1084.

The Court finds that a question of fact exists as to pretext. The fact that Taylor was terminated shortly after attempts to resolve several matters, including this case, failed, is troubling. Furthermore, one month after this case was filed and approximately 45 days prior to his termination, Taylor was formally disciplined by way of a verbal warning, his first in over twenty-five years of employment. Although this Court above found that such discipline was not an adverse action, it can be considered as a factor in

17

terms of a retaliatory environment or an "atmosphere of retaliation." *See Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 549 (6th Cir. 2008). Contributing to this "atmosphere" is the "DIE OSHA FAG" note, Judd's threat to teach the whistleblower a lesson and Fuller's failure to properly investigate the vandalism to Taylor's car.

Plaintiff also argues that Fuller was looking for a reason to terminate Taylor when it reviewed the "mirror image" of his company-issued computer. Fuller asserts that it did so in an attempt to preserve evidence as it required by Civ. R. 26. However, the mirror image was already in Fuller's custody as it had been obtained the month before. There is no evidence that any discovery requests were outstanding which would have required Fuller to review the contents of Taylor's computer at that time. Although, this is a close question, it is one for a trier of fact to determine, not this court. In addition, there is evidence that Fuller had a progressive discipline system which was not applied to Taylor.

Taking all the above together and viewing it in Taylor's favor, the Court finds that the evidence supports an inference of retaliation and that it satisfies the second element of the *Manzer* test. See *Manzer*, 29 F.3d at 1084 (explaining that, under the second approach to proving retaliation, a plaintiff shows that the "sheer weight of the circumstantial evidence of [retaliation] makes it 'more likely than not' that the employer's explanation is a pretext, or coverup").

Although Plaintiff argues that other facts also show pretext, the Court declines to evaluate those facts at this time given that it has already found a question of fact exists.

VI. <u>Motion to Strike</u>

The Court did not consider the affidavit of Jeremy Wunsch in this decision. Therefore, the Court denies the motion as moot. However, if Plaintiff chooses to

challenge Mr. Wunsch's testimony as an expert witness at trial this issue may be brought to the Court's attention via a verbal motion in limine as the matter as already been briefed to the Court.

V.      Conclusion

For the foregoing reasons, Defendant's motion for summary judgment (Doc. 21) is DENIED, in part, and GRANTED, in part.  Also, Plaintiff's motion to strike (Doc. 40) is DENIED as moot.

**IT IS SO ORDERED**.

_s/Michael R. Barrett_
Michael R. Barrett, Judge
United States District Court